IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

ELMER MENDEZ; ELENA MEJIA- MENDEZ,
ON BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES OF CARLOS MEJIA-MENDEZ,
DECEASED; AND EVER ALEXANDER AMAYA-MENDEZ,
ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES
OF MARVIN NOE AMAYA-MENDEZ DECEASED                    PLAINTIFFS


V.                                    CIVIL ACTION NO.: 1:22-cv-00125-MPM-DAS


SUMMIT HOUSING TRANSPORT, LLC;
GREGORY BURNS; WINSTON
HOUSING GROUP, INC.; HAMILTON
HOME BUILDERS, LLC; HAMBY
TRUCKING, INC., D/B/A HAMBY
ESCORT; AND JOHN DOES 2-20                              DEFENDANTS


## ORDER

This cause comes before the court on various summary judgment and *Daubert* motions filed by the parties in the above-entitled action. The court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a tort action arising from a July 1, 2020 automobile accident on the intersection of Highway 25 and 45 in Monroe County, Mississippi. The accident occurred when a vehicle driven by Jose Mendez veered from its proper driving lane and ran into the back of a newly-manufactured mobile home which had been stopped alongside of the highway. The mobile home was being transported from the Alabama factory of defendant Winston Housing Group, Inc. ("Winston") to a purchasing dealer in Mississippi, and defendant Summit Housing Transport, LLC ("Summit") had been hired by Winston as an independent contractor to perform

the transport of the vehicle. Defendant Gregory Burns was acting as the driver, on behalf of Summit, of the Peterbilt truck which was towing the mobile home to its destination.

As noted above, defendants have filed both summary judgment and *Daubert* motions in this case, and this court will, in this order, discuss the experts whom defendants seek to strike alongside the summary judgment issues to which the proposed testimony of those experts relate. It is well settled that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute arises "if, based on the evidence, a reasonable jury could return a verdict for the nonmoving party." *Lett v. Omega Protein, Inc*., 487 F. App'x 839, 843 (5th Cir. 2012) (citation omitted). A fact is material if it is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

Expert testimony is not admissible unless the expert is qualified and the opinion is scientifically valid and methodologically sound. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). The party offering the expert testimony bears the burden of proving that the testimony is admissible. *Smith v. Goodyear Tire & Co.*, 495 F.3d 224, 227 (5th Cir. 2007). The expert must base the opinion on sufficient facts or data, employ reliable principles and methods in forming the opinion, and reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702. The purpose of the *Daubert* inquiry is to ensure that the proposed expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Before providing a specific discussion of the parties' arguments, this court will provide its basic impressions of the factual merits of this case. The amended complaint in this case

alleges, and it appears to be undisputed, that Burns' truck had been forced to stop alongside the highway "due to the failure of the tow hitch used to connect the mobile home to the truck for transport." [Amended complaint at 4]. As discussed below, Burns testified in his deposition that he was not able to pull as far onto the shoulder as he ordinarily would have, given that rainy weather that day had made the ground wet. [Burns depo. at p. 89]. Plaintiffs allege that this decision on the part of Burns to minimize the risk of having his vehicle stuck in the mud at the expense of public safety, as well as the basic decision to transport the vehicle on a rainy day, constituted negligence on the part of one or more defendants. Plaintiffs further allege that the failure of the trailer hitch resulted from design and/or manufacturing defects by Winston, as well as from negligence arising from the decision to transport a mobile home using a trailer hitch which was insufficiently strong to tow the large mobile home in question. As a result of the collision, plaintiff Elmer Mendez suffered serious injuries and Carlos Mejia-Mendez and Marvin Noe Amaya-Mendez died. [Complaint at 5]. Carlos and Marvin's wrongful death beneficiaries are plaintiffs in this action, but the driver Jose Mendez is not a party in this case.

Having noted the broad facts of this case, this court's basic impression is that they give rise to certain strengths and weaknesses which each side must confront. As to plaintiffs, it strikes this court that, while it seems possible that certain factors such as wet roads may have caused Jose's vehicle to veer from its proper driving lane, it frankly seems more likely that this lane departure was the result of some form of negligence on his part, such as his falling asleep. Similarly, while it seems possible that the failure of a tow hitch transporting a newly-manufactured vehicle would be something which "just happened," it frankly seems more likely to have been the result of either a failure in the design or manufacturing process or negligence in transporting this particular mobile home to its destination. More specifically, this court believes that plaintiffs' arguments relating to the decisions to perform the transport on a rainy day and not

to pull further onto the shoulder in the interests of public safety give rise to triable jury issues regarding negligence.

These factual strengths and weaknesses give rise to difficult causation issues in this case, since each side (predictably) seeks to emphasize the role which the opposing side's alleged wrongdoing may have had in causing the accident.[1] Indeed, in considering the parties' causation arguments, it strikes this court that each side can quite reasonably argue that the injuries in this case would not have occurred "but for" the negligence of the other. That is, defendants can quite reasonably argue that, if Jose's vehicle had not veered from its proper lane, then it would not have struck the mobile home which was parked along the side of the highway. By the same token, plaintiffs have a quite reasonable argument that, if the mobile home had not been parked alongside the highway in the first place, then Jose's vehicle would not have hit it and Elmer and Carlos would still be alive today. In this vein, this case appears to involve, from a causation standpoint, an example of an irresistible force colliding with an immovable object, and this court must therefore grapple with the difficult question of what the legal result of this collision should be.

While, as discussed below, Mississippi law is not entirely clear as to how difficult causation issues such as these should be dealt with on summary judgment, this court's general inclination, when presented with a case where both sides have reasonable arguments relating to both negligence and causation, is to allow them to present those arguments at trial and allow jurors to sort these issues out. This inclination is particularly strong in a case such as this one, in

---

[1] This court reiterates that Jose is not a plaintiff in this lawsuit, and he is therefore not, strictly speaking, on plaintiffs' "side." Nevertheless, plaintiffs clearly have an interest in de-emphasizing Jose's alleged wrongdoing and emphasizing defendants' alleged wrongdoing, thus rendering them effectively aligned with Jose in this case.

which the lawyering on both sides seems quite good, and both sides appear to be making diligent and competent efforts to represent their clients.

Given that both sides have legitimate negligence arguments to make and are diligently attempting to do so, this court will give each side considerable leeway to continue to represent their clients in the manner which they have done to date. In this vein, this court notes that while various defendants have sought summary judgment on a wide range of damages and liability issues, its general practice, in cases where it is clear that a trial will be required, is to reserve a final ruling on many specific liability and damages issues for the directed verdict and/or jury instruction phases of trial. This court's inclination to do so arises from the simple fact that, in cases where a trial will be required regardless, it makes sense to reserve ruling upon most damages and liability issues until the point when this court has already viewed the evidence at trial and accordingly has a much better factual grasp of the case. At the same time, this court recognizes that defendants do raise certain issues which should be discussed in this summary judgment order, partly so that the parties may respond to its inclinations expressed herein with further argument and/or authorities at trial.

The first issue which this court will address in this order is the primary argument raised both by Summit/Burns and Winston in their respective summary judgment motions, which is that they should be dismissed from this action because the negligence of Jose Mendez in departing from his proper lane of travel was the sole proximate cause of the accident in this case. This court has already previewed its ruling on this issue above, but, in providing a more specific discussion of its inclination in this regard, it will make two primary points. The first point is to note that both sides appear to have made a tactical choice not to depose Jose, and this court

believes that decision has left a rather sparse factual record which works in plaintiffs' favor on summary judgment.

After ascertaining that neither side had deposed a crucial fact witness such as Jose, this court, through its staff, emailed the counsel for both sides to inquire regarding their failure to do so. This court specifically wondered whether Jose, as an undocumented immigrant, might have made himself unavailable for depositions, but it was assured that this was not the case and that his residence in Memphis was known to all parties. It thus seems clear that the decision not to depose Jose was a tactical choice made by both sides, presumably based on fears that certain elements of Jose's testimony would be harmful to their respective clients. This court will not second-guess that tactical decision here, but the simple fact is that, at the summary judgment stage, this court must view the facts in the light most favorable to plaintiffs, and it must resolve any factual ambiguities in their favor as well. That being the case, defendants leave themselves in a poor position to seek summary judgment based on Jose's negligence when they could have deposed him but chose not to do so. This is particularly true considering that there are very serious doubts regarding whether some of the most important evidence cited by defendants in support of their negligence arguments constitutes admissible evidence at all.

Winston notes in its brief that "[a]ccording to hospital records, Jose told emergency room staff that 'he thinks he fell asleep,'" [reply brief at 3] and this court agrees that, if admissible, this statement would represent strong evidence of negligence on his part. However, plaintiffs rather predictably argue that Jose's alleged statement is hearsay, to which Winston argues that:

> Regarding Jose Mendez's comments/remarks to medical personnel that he fell asleep while operating the Nissan pickup truck, the same is not "impermissible hearsay". The fact that Jose Mendez fell asleep while operating the Nissan which he drove into the rear of the manufactured home is specifically noted within the Mississippi Uniform Crash Report. [204-1], 3 p. 7, § DRIVER CONDITION AND CIRCUMSTANCES ("Asleep or fatigued"). Meaning both Jose Mendez's treating physicians and the officer who drafted

the Crash Report knew and provided specific comment that Jose Mendez fell asleep while operating the Nissan at issue.

[Reply brief at 2-3].

Notably absent from defendant's argument is any citation to an applicable exception to the hearsay rule, or any discussion of hearsay law whatsoever for that matter. While this court does not intend to argue with itself over this issue, its first impression is that, unless defendants have identified and will call to testify at trial the hospital employee or police officer who allegedly heard Jose make the statement in question, then the notation regarding Jose's statement would not only be hearsay but double hearsay.[2] It further strikes this court that, while Jose is not a party to this lawsuit so as make his alleged statement an admission by a party opponent, it arguably constitutes a declaration against interest under Federal Rules of Evidence 804(b)(3). However, this particular exception to the hearsay rule only applies if the declarant in question is unavailable, and, as noted above, the parties have assured this court that Jose is available to testify. This court therefore believes that defendants should seriously considering calling Jose to testify at trial, where they will presumably ask him about his alleged statement in this hospital and, at least potentially, introduce the records in question as impeachment evidence if he denies having said that he "thinks he fell asleep." As things stand now, however, the evidentiary basis for introducing Jose's alleged statement strikes this court as very much unclear, and this necessarily works to defendants' detriment in seeking summary judgment.

The failure to depose Jose aside, Summit concedes in its reply brief that "it was raining lightly at the time of the collision," [reply brief at 3] which strikes this court as a potential

---

[2] It seems possible that defendants might be able to avoid calling the hospital employee by establishing that the notation constitutes a business record under FRE 803(6). However, this would still leave Jose's alleged statement as hearsay, for which defendants would presumably need to find some applicable hearsay exception.

contributing factor for Jose's having left his proper lane of travel which would not involve his own negligence. Summit argues that the record is simply unclear as to whether wet road conditions played a role in this regard, writing in its reply brief that:

> Plaintiffs do not appear to argue that the weather conditions at the time of the collision played any part in causing this collision. If they are, there is no evidence in the record to support this argument. And Plaintiffs have chosen to forego an explanation from Jose Mendez as to why he left his lane of travel entirely. Without Jose's testimony, it is pure speculation to assume that weather played any part in his actions.

[Reply brief at 3-4].

This court's reading of plaintiffs' briefing is that, contrary to defendant's assertion, they maintain that wet weather figures very prominently in the events of this case. For example, plaintiffs argue in their brief that:

> The Crash Report and testimony of the drivers suggest that it had been raining before the collision and at the time of impact. Inclement weather alone in these instances has been found to be sufficient to preclude judgment as a matter of law. *Dallas v. Premier Vehicle Transp., Inc.,* 2017 U.S. Dist. LEXIS 124096, *4 (S.D. Miss. 2017).

[Plaintiff's brief at 9-10]. While plaintiffs did not specifically argue that wet road conditions caused Jose to leave his proper lane, they clearly seem to argue that the effect of wet road conditions on an accident is a factual wild card of sorts which is best addressed by a jury, rather than a court. This court agrees, and, in so doing, it emphasizes defendant's concession that "[w]ithout Jose's testimony, it is pure speculation to assume that weather played any part in his actions." *Id.* In so arguing, defendant seems to suggest that uncertainty regarding a potentially crucial factual issue supports the entry of summary judgment in its favor, but this court regards the existence of fact issues regarding weather conditions at the time of the accident as a factor which militates in favor of further inquiry at trial, and not dismissal of the case based on a sparse summary judgment record.

The above observations seem particularly apt in this case, considering that defendants could have deposed Jose themselves but chose not to do so. Moreover, while it is true that plaintiffs bear the ultimate burden of proof regarding causation, it appears that, by alleging negligence on the part of a non-party such as Jose, defendants are attempting to avail themselves of the so-called "empty chair defense" to their own liability. In this vein, this court notes that, in a 2009 decision, Judge Aycock observed that "[d]efendants are allowed to present the 'empty chair' defense and show that plaintiff's damage was caused by the sole or intervening fault or acts of third parties." *Cooper Tire & Rubber Co. v. Farese*, 2009 WL 10675478, at \*4 (N.D. Miss. Jan. 8, 2009). The Fifth Circuit has similarly referred to the allocation of fault to third parties under Mississippi's comparative fault statute as the "empty chair defense," *Whitehead v. Food Max of Mississippi, Inc.,* 163 F.3d 265, 279 (5th Cir. 1998) citing § 85-5-7, and this court's understanding of defenses is that *defendants* bear the burden of proving them. Judge Aycock clearly seems to have this understanding as well, inasmuch as, in *Cooper*, she referred to the fault of absent non-parties as something the defendant must "show." *Cooper*, 2009 WL 10675478 at 4. In any event, this court is presently considering defendants' summary judgment motion, and it is clear that, in doing so, it must resolve factual ambiguities in plaintiffs' favor. This court therefore regards the absence of Jose's deposition testimony as something which clearly militates against granting defendants' summary judgment motions.

This court notes that, in their briefing, plaintiffs cite wet road conditions as a crucial factor in analyzing the actions of the driver Burns in this case, as well as the basic decision on the part of various defendants to transport the mobile home on a rainy day. For example, plaintiffs rely upon Burns' deposition testimony that:

> Gregory Burns' testimony illustrates that he was more concerned with the possibility that the mobile home might become stuck in the wet ground than in removing the truck and

home completely from the roadway. When asked whether he pulled the truck over as far
as possible, he gave a qualified answer, "I did as far as I could with the—with the ground
as wet as it was, yes, ma'am, I did." See Exhibit "2" p. 85, lines 3-7. This conversation
continued:

Q: So is there a specific reason, though, that you could not have gotten the entire
manufactured home farther over to the shoulder, even into the grassy area?
A: No, I couldn't have gotten over there. The ground was too soft, ma'am. And dragging
that house and it down in the front, no, ma'am, I couldn't have got out in the grass.
Q: Why was the ground too soft?
A: Because it had rained.

[Brief at 4-5, citing Burns depo. at p. 89]. Burns thus made it clear in his deposition that while

he could have physically moved his truck further onto the shoulder, he chose not to do so based

on concerns that his vehicle would get stuck in the mud.

It strikes this court that, in making this choice, Burns made a conscious decision to accept

the evident danger to motorists which results from not pulling over as far as he would ordinarily

prefer to do, in order to avoid his vehicle potentially having to be towed out of the mud. This

court further believes that, in making this choice, Burns made a decision which plaintiffs can

reasonably argue to the jury constituted negligence on his part. Moreover, even if jurors

conclude that Burns made the correct choice in not parking his vehicle on wet ground, they may

decide that Winston or some other defendant should not have chosen to transport the vehicle on a

rainy day and thereby potentially subject the driver to this choice. That is, plaintiffs would

appear to have a reasonable jury argument that Winston or some other defendant should have

known that, if problems arose which required the driver to pull over, wet conditions might

prevent him from pulling over as far as motorist safety considerations would recommend. This

court therefore concludes that plaintiffs have reasonable arguments that wet weather conditions

assist them in making out their claims. In the court's view, this makes it that much more

important that defendants support their allegations of Jose's negligence with a greater amount of

competent and admissible summary judgment evidence than they have produced in support of their motions.

The sparse summary judgment record aside, the second, and perhaps more important, conclusion supporting this court's denial of summary judgment is its conclusion that Mississippi appellate precedent casts serious doubt upon defendants' contention that any presumed negligence on the part of Jose, such as his allegedly falling asleep at the wheel, would necessarily preclude liability on their part. Defendants' position in this case appears to be that, since Jose fell asleep or was otherwise negligent in veering from his driving lane and running into the back of a wide load trailer, it is essentially irrelevant whether one or more defendants were themselves negligent in allowing that trailer to be on the side of the highway in the first place. For example, Summit writes in its summary judgment brief that:

> Plaintiffs have failed to produce any substantiated, admissible evidence that anyone other than Jose Mendez was a proximate, contributing cause of this accident. Just last week, the Mississippi Court of Appeals unanimously upheld the granting of summary judgment in a case with strikingly similar facts to the instant case. *Carter v. C&S Canopy, Inc.,* 381 So. 3d 399, 406 (Miss. Ct. App. 2024). In *Carter*, a vehicle in which the plaintiff was a passenger sideswiped a fixed-body truck that was parked on the paved shoulder alongside Interstate 10 and out of the lanes of travel. Plaintiff sued the truck driver (Ballew) and his employer (C&S) for negligence. Just like in the instant case, the driver of Plaintiff's vehicle veered out of his lane "for unknown reasons" and sideswiped Ballew's truck. *Id.* at *2. The defendants moved for summary judgment, arguing that Plaintiff was unable to establish that either defendant breached a duty or that any alleged breach proximately caused the crash. The circuit court granted the motion, noting "there is an analytical gap in the evidence demonstrating how a purported failure [in warning triangle placement] proximately contributed to the cause of the accident in this case." *Id.* at *4.

[Brief at 7].

While defendant appears to be correct that *Carter* is the most factually analogous Mississippi authority on point, this court believes that the evidence of its own negligence in this case is considerably stronger than the plaintiff's proof of negligence was in *Carter*. In so stating, this court notes that the evidence in *Carter* indicated that the driver of the truck in that case was

forced to stop by an unexpected and serious mechanical issue which was no fault of his own. *Carter*, 381 So. 3d at 402. Clearly, unexpected mechanical issues are something which can happen to any driver, and the fact that one occurs does not constitute proof of negligence. This case, by contrast, involves the failure of the trailer hitch connecting the mobile home and the vehicle which was towing it. In the court's view, a failure of this nature raises more obvious questions of negligence than a more routine mechanical breakdown, since it raises questions regarding, among other things, the choices which were made by defendants regarding the means which were used to transport the mobile home in question. In opposing summary judgment, plaintiffs buttress these rather suspicious circumstances with expert testimony suggesting that one or more defendants selected a trailer hookup which was inadequate to transport a home as large as the one at issue in this case.

While plaintiffs offer other allegations of negligence in this case, including that Burns did not pull far enough onto the shoulder of the highway, any proof that defendant's negligence caused the vehicle to be on the side of the road in the first place seems particularly compelling. This is because, while the Mississippi Court of Appeals in *Carter* cautioned against relying upon overly speculative proof that the defendant's specific actions (such as not adequately warning motorists of the stopped vehicle) caused the accident in question, it is hardly speculative to argue that Jose would not have run into defendant's vehicle if it had not been on the side of the highway at all. This is, to the contrary, seemingly an indisputable fact. Moreover, unlike in *Carter*, plaintiffs do, in fact, have a coherent theory, supported by expert testimony, that the negligence of one or more defendants in selecting the towing arrangement in this case caused the vehicle to be on the side of the highway in the first place. Indeed, expert testimony aside, this court believes that jurors may well conclude that mechanical hookups tend not to simply fail for

no good reason and that the apparent failure of defendant's towing arrangements in this case is something regarding which it owes a good explanation.

In the court's view, another important factor which renders plaintiffs' proof of negligence stronger than in *Carter* arises from the simple fact that this case involves the transporting of a large mobile home over public highways. While defendants do not face strict liability while transporting wide loads, the fact that towed mobile homes are (at least in this court's experience) invariably accompanied by escort vehicles clearly constitutes a nod to the risks which are inherent in this undertaking. That being the case, this court believes that plaintiffs, and their experts, can more reasonably argue to the jury that defendants acted negligently in towing their mobile home on a rainy day and in not adequately insuring that the trailer hitch was adequate for the load in this case, than if they had been towing an object which was not oversized. This court further concludes that plaintiffs have potentially strong arguments that some form of manufacturing and/or design failure on the part of Winston contributed to the fact that its mobile home found itself parked along the side of a highway on the day in question.

In so stating, this court would observe that, by their very nature, mobile homes should be designed to withstand transport on public roads and highways, otherwise they cannot reach their end users. Moreover, the simple fact is that the mobile home at issue here did not, in fact, withstand the transport process, and this court believes that jurors will be looking to defendant to provide a good explanation for this fact. This court notes that Winston itself appears to be somewhat uncomfortable with the basic facts of this case, since it writes that in its brief that:

> Around 7:45 am on July 1, 2020, before entering onto U.S. Hwy. 45A South from M.S. Hwy. 25 an issue arose during transport which prompted Burns to pull over as far onto the shoulder as he could and ensured that no portion of Burns' vehicle and/or manufactured home extended into the two southbound lanes of U.S. Hwy. 45A South.

[Reply brief at 8]. In the court's view, saying that "an issue arose during transport" is a rather dry description of what happened to the newly manufactured mobile home in this case, and it seems possible that jurors will offer a less charitable characterization of it.

This court believes that the fact that triable fact issues exist regarding Winston's liability seems clear enough from its reply brief, where it writes that:

> In regard to plaintiffs' alleged "failure" of the hitch, the very testimony they cite to in support of their position demonstrates that the issue with the hitch only arose after the toter hit "[a] pretty rough – a pretty bad rough spot." [205], Ex. "4," pp. 89 – 90. As such, this atypical road condition does not support Plaintiffs' position that the manufactured home's design lacked sufficient durability.

[Reply brief at 6-7]. Defendant thus emphasizes allegedly rough road conditions at the accident location, but, to be clear, at the time he was forced to pull over, Burns was not driving over a bumpy dirt road; he was traveling on a public highway. It at least seems arguable to this court that, since mobile home occupants do sometimes live on bumpy dirt roads, a manufacturer should design a mobile home which is sufficiently durable to withstand transport even under those truly difficult road conditions. In any event, Winston's argument that the stretch of highway at issue here was so "atypical" as to excuse the failure of its trailer hitch is clearly one that it will need to make to jurors, since it does not constitute a proper basis for summary judgment.

In light of the foregoing, this court regards plaintiffs' negligence and products liability claims, considered together, as being considerably stronger than the plaintiff's proof of negligence in *Carter*. Perhaps more importantly, it seems implicit from the Court of Appeals' analysis in *Carter* that the presumed negligence of a plaintiff in running into the back of a parked vehicle does not render the question of the defendant's own negligence an irrelevant one. Indeed, given the clear similarities between the facts of this case and *Carter*, it is problematic for

defendants that, even though the Court of Appeals expressly wrote that "we can only conclude that the plaintiff fell asleep or failed to pay attention" *id.* at 406, it nevertheless spent most of its opinion discussing, and rejecting, the various theories offered by the plaintiff as to how the defendant had been negligent.

In introducing its lengthy discussion of these theories, the Court of Appeals wrote that:

> On appeal, Carter argues that Ballew negligently continued to drive a "sluggish" truck down the interstate rather than exiting; that C&S negligently failed to have the truck towed sooner; that Ballew violated Federal Motor Carrier Safety Regulations (FMCSRs) by placing emergency reflective triangles at incorrect distances behind his truck; that "Ballew broke the law" by parking the disabled truck on the shoulder of the interstate; that C&S lacked authority to operate as a "for-hire motor carrier"; that C&S failed to train Ballew; and that these various acts or omissions caused the subject crash. We address Carter's various arguments in turn.

*Id.* at 404.

Thus, not only did the Court of Appeals in *Carter* not appear to regard the question of the defendant's negligence as irrelevant in light of the plaintiff's presumed negligence; it spent most of its opinion rejecting, one after the other, each of the plaintiff's factual arguments as to how defendant might have been negligent. This court emphasizes once again that the Court of Appeals in *Carter* expressly assumed that the plaintiff in that case fell asleep or otherwise acted negligently in running into the back of the truck in that case. It strikes this court that, if defendant's understanding of Mississippi law were correct, then the Court of Appeals would have simply stopped at that point. Instead of doing so, the Court provided an extensive discussion of the plaintiff's various theories of negligence, and this court must wonder why it would have done so if, as defendant suggests, the plaintiff's contributory negligence were the beginning and end of liability issues of this nature.

While the Court of Appeals in *Carter* found the plaintiff's proof that various steps such as better placement of warning signs would have prevented the accident in that case to be

15

"speculative," it is, to reiterate, not speculative to argue that the accident in this case would not have occurred if Burns had not been forced to pull off the road in the first place. In so stating, this court notes that photos of the accident scene reveal that the stretch of highway where the accident occurred was surrounded by gently sloping grass leading into a cornfield. That being the case, it seems highly likely to this court that, if defendant's truck had not been parked alongside the highway, then Jose would have paid for any alleged negligence in falling asleep by, at worst, having his vehicle towed from a corn field. Indeed, this court suspects that most drivers have, at one time or another in their lives, nodded off while driving on a highway, only to be jarred awake by the sound of their vehicle hitting the shoulder of the road and/or by the alarmed cries of passengers. While falling asleep at the wheel clearly does appear to constitute negligence in most cases, it is a form of negligence which ordinarily does not result in the loss of life. In this case, however, Jose paid for any presumed negligence on his part by having two of his passengers killed, and plaintiffs provide substantial arguments that the crucial factor distinguishing trivial or non-existent injuries from fatal ones in this case was the negligence of one or more defendants.

Under these circumstances, this court can discern very strong public policy arguments that the law should provide legal incentives for those transporting a large trailer on a highway to exercise due care in ensuring that the transport arrangements are planned and executed in a manner consistent with public safety. This court does not believe that these public policy arguments lose their force even if it is assumed that the vast majority of attentive drivers would recognize the large mobile home parked ahead of them and avoid it without difficulty. To the contrary, this court submits that there are strong public policy arguments in favor of encouraging mobile home transporters to exercise due care in putting their dangerous instrumentality on

public highways in such a manner as to ensure that even negligent drivers do not unnecessarily pay for simple negligence with their lives.

In light of the foregoing, this court concludes that both sides have legitimate liability and causation arguments to make to the jury, and this conclusion heavily informs its consideration of defendants' *Daubert* motion to strike the testimony of plaintiffs' designated expert witnesses Joseph Russo, Jeffrey E. Hofmann and Bruce Enz. In their brief, plaintiffs note that:

> Russo has "more than 39 years experience as a hands-on business owner-operator" in the manufactured and modular home industry. Russo has performed and directed performance of manufactured/mobile home "service, installation, take down, delivery…project design..home transporting on and off highway with specialized heavy equipment, [and] home installation." He also has provided expert witness services related to the industry, providing analysis in more than 150 litigation matters throughout the United States and twice for the Contractors State License Board. Because of his practical experience, Russo is familiar with manufactured/mobile home transportation, service, repair (including of structures, chassis, and axles), and manufacturing procedures. Response Exhibit "1," Russo CV. Jeffrey Hofman is a licensed professional engineer, having obtained his license in 1991 in the State of California. He received his B.S. degree in Civil Engineering from California State University in 1988. He has significant experience in the engineering aspects of manufactured home design. Response Exhibit "2," Hofmann CV.

[Brief at 2]. As to Enz, plaintiffs write that:

> Enz is an expert in accident reconstruction, vehicle underride crash analysis [this case was an underride crash], and fleet safety involving commercial vehicles. Enz holds a bachelor's degree from the University of Illinois, which was conferred in 1977. Prior to obtaining his college degree, Enz served in the military and in law enforcement. … He has taken various accident investigation courses, including completing the Multidisciplinary Highway Collision Training Course sponsored by the U.S. Department of Transportation (USDOT), National Highway Traffic Safety Administration (NHTSA), in 1978. He has also taken graduate level courses in forensic sciences. Response Exhibit "1," Enz CV. Since 1978, Enz has worked professionally in the area of accident investigations and reconstruction. This experience has included serving on a Multidisciplinary Accident Investigation Team under a contract awarded by USDOT/NHTSA. He has also provided traffic accident investigation and analysis to various government agencies and private parties. In his present position, held since 1997, Enz has been involved in accident investigation, reconstruction and analysis in a variety of settings.

[Brief at 2].

This court agrees with plaintiffs that these experts are fully qualified to offer testimony regarding various liability issues in this case, and, for the reasons discussed above, it believes that the basic facts of this case give them considerable factual material to work with in arguing that one or more defendants violated applicable legal standards in this case. In considering the reliability of fully qualified expert witnesses, this court is much more inclined to strike those opinions if the experts are offering opinions which seem suspect based on this court's understanding of the facts of the case. That is not the case here. Moreover, this court would emphasize that striking a particular expert is not necessarily in order if the opposing side is able to adequately demonstrate to the jury the weaknesses of that expert's methodologies on cross-examination. Indeed, this court can recall more than one instance in which effective cross-examination managed to turn a supposed expert for one side into a *de facto* expert for the opposing side. This strikes this court as an entirely normal and desirable part of the fact-finding process, and it obviously would not have occurred if the expert in question had been struck outright before trial.

In reading defendants' *Daubert* motions, this court's impression is that, at certain points, they appear to "score points" in pointing out certain weaknesses in a particular opinion offered by plaintiffs' experts. This is hardly surprising, however, and it does not constitute sufficient basis to strike the experts outright. As noted previously, this court believes that both sides have factual strengths and weaknesses in this case, and, that being the case, it anticipates that both sides will, in fact, be able to "score points" in cross-examining the other side's experts. This court believes that plaintiffs have valid liability and causation arguments to make in this case, however, and it concludes that they have retained fully qualified experts who seek to offer opinions which, while hardly unimpeachable, fall well within the range of admissible expert

18

testimony under *Daubert*. Defendants' motions to strike the expert testimony of Russo, Hoffman and Enz will therefore be denied.

This court will provide a separate discussion of defendants' motion to strike the expert testimony of plaintiffs' economics/damages expert Bill Brister, since his proposed testimony relates to certain difficult legal issues which require extensive consideration in this order. Plaintiffs have designated Brister to provide expert testimony regarding the present net cash value of the life expectancy of Carlos Mejia-Mendez and Marvin Noe Amaya-Mendezm, the two men who died in the subject collision. In their brief, plaintiffs note that:

> Dr. Brister holds a B.S. degree in Economics, an MBA in Economics, and a Ph.D. in Finance. Dr. Brister is an Assistant Professor of Finance at Millsaps College in Jackson, Mississippi. Dr. Brister has taught at Millsaps College for over 30 years, since 1989. Prior to that, he held other teaching positions at the University of Arkansas and the University of Southern Mississippi. As a college professor, Dr. Brister has taught a variety of courses in his field, including Principles of Economics and Business Statistics. Dr. Brister is a frequent author and speaker in the field of economics, including loss valuation in legal cases and statistics. He is a member of the National Association of Forensic Economics, "an organization for the advancement and exchange of research and methods in the field of forensic economics." Dr. Brister has also been qualified as an expert witness and testified extensively in state and federal courts.

[Brief at 1-2]

This court agrees with plaintiffs that Dr. Brister is fully qualified to offer expert testimony, and it notes that having an economist testify regarding the present net cash value of the decedent's life is a well-established part of a wrongful death action in this state. The difficulty faced by plaintiffs in this case relates not to Dr. Brister's qualifications or the general nature of his testimony, but, rather, to the fact that the two decedents in this case were undocumented immigrants. This gives rise to difficult issues which plaintiffs must confront, of both a legal and factual nature. This court notes that defendants' motion to strike Brister's

testimony is closely related to their motion for summary judgment as to plaintiffs' claims for specific damages, and this court will consider them together.

While conceding much of defendants' summary judgment motion on specific damages,[3] plaintiffs take strong issue with the motion to strike their claims for lost wages. As to these damages, defendants argue that (1) plaintiffs' immigration status precludes recovery for such wages as a matter of law based on U.S. Supreme Court precedent (2) plaintiffs' factual support for such damages is insufficient since their undocumented work history left a sparse "paper trail" and (3) the plaintiffs seek to make impermissible use of hearsay from the two decedents to establish the amount of their lost wages. [Summit's rebuttal brief at 1]. This court believes that defendants have good faith arguments on each of these points, and it will discuss them in turn.

In arguing that plaintiffs' immigration status precludes their recovery of lost wages, defendants rely primarily upon the U.S. Supreme Court's decision in *Hoffman Plastics Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 122 S. Ct. 1275 (2002). In *Hoffman*, the Supreme Court considered a challenge brought under the National Labor Relations Act ("NLRA") by an undocumented immigrant who was not lawfully entitled to be present in the United States and who had used false documentation to obtain employment in violation of provisions of the Immigration Reform and Control Act of 1986 ("IRCA"). 535 U.S. at 141, 122 S. Ct. 1275. The Supreme Court held that federal immigration policy, as expressed in IRCA, precluded the NLRB from awarding backpay to the undocumented alien, despite the employer's violation of labor laws. *Id.* at 149, 151, 122 S. Ct. 1275. The Court noted that the IRCA regime makes it "impossible for an undocumented alien to obtain employment in the United States without some

---

[3] In responding to that motion, plaintiffs concede that their claims for future medical expenses, conscious pain and suffering, and funeral expenses should be dismissed, [brief at 1]. and summary judgment will accordingly be granted as to these elements of damages.

party directly contravening explicit congressional policies" because "[e]ither the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations." *Id.* at 149, 122 S.Ct. 1275. To thus allow an undocumented alien to recover backpay, the Court concluded, "for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by criminal fraud," *id.,* would "encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations," *id.* at 151, 122 S.Ct. 1275.

The Supreme Court's decision in *Hoffman* has given rise to an almost bewildering maze of interpretive precedent, in various legal contexts, and the courts deciding those issues have reached widely divergent results. This court is presently concerned with the state tort law implications of *Hoffman*, and, as noted by one commentator in a recent law journal article:

> The battle surrounding undocumented tort plaintiffs' ability to recover future lost wages has been fought on multiple fronts in both state and federal courts, many of which provide conflicting analyses and holdings. Some courts center their review on federal preemption doctrine to analyze whether *Hoffman* and IRCA preempt state law claims by undocumented plaintiffs for future lost wages. Others focus on whether evidence of immigration status should be permitted under evidentiary rules of relevance. Even when courts agree on issues of preemption and relevancy, they diverge with respect to what standard should be used to calculate future lost wages. Some permit weighing of immigration status when the plaintiff used fraudulent documentation to obtain past employment,[26] some limit awards to wage rates in a plaintiff's country of origin, some require proof that a plaintiff is more likely than not to be deported before permitting immigration status evidence,[28] and some prohibit this evidence altogether. To confuse matters further, many of these cases rely on earlier caselaw that does not sound in tort but rather, examines claims under state employment and labor laws.

Shefali Milczarek-Desai, Disentangling Immigration Policy from Tort Claims for Future Lost Wages, 16 J. Tort L. 255, 257–59 (2023)(citations omitted).

A number of federal courts have concluded that, *Hoffman* notwithstanding, the question of whether undocumented immigrants are entitled to recover lost wages in tort actions is, in diversity cases, a question of state law to be decided by a state's highest court. Typical of these decisions is an Illinois district court decision which observed that:

> Because state law governs substantive issues in a diversity action, *Gacek v. American Airlines, Inc.,* 614 F.3d 298, 301 (7th Cir. 2010), it is necessary in this case to determine whether an undocumented alien may recover future lost earnings under Illinois law. The Illinois Supreme Court has not answered this question. *See Fidelity Union Trust Co. v. Field,* 311 U.S. 169, 177, 61 S. Ct. 176, 85 L. Ed. 109 (1940) ("The highest state court is the final authority on state law."). In the absence of Illinois Supreme Court precedent, this court looks to decisions of the Illinois Appellate Court. *See id.* at 177–78, 61 S.Ct. 176; *see also Arnold v. Metro. Life Ins. Co.,* 970 F.2d 360, 361 (7th Cir.1992).

*Wielgus v. Ryobi Techs., Inc.,* 875 F. Supp. 2d 854, 858–59 (N.D. Ill. 2012).

As a district court located in the Fifth Circuit, this court is particularly interested in case law arising from this circuit. This court therefore regards it as significant that Texas federal courts have, like the Illinois district court, regarded this as a question of state law. Moreover, Texas federal district courts have, in multiple decisions, applied a 2003 Texas state appellate court decision which held that "Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering damages for lost earning capacity." *See Tyson Foods, Inc. v. Guzman,* 116 S.W.3d 233, 244 (Tex. App. –Tyler 2003, no pet.). In a 2007 decision, for example, a Texas district court wrote that:

> "Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering damages for lost earning capacity." *Id.; see also Madeira v. Affordable Housing Foundation, Inc.,* 469 F.3d 219, 228 (2nd Cir. 2006). It is, therefore, ORDERED that the Defendants' "Motion for to Exclude Damages for Lost Earning Capacity", filed on September 18, 2007 is DENIED**.**

*Contreras v. KV Trucking, Inc.,* 2007 WL 2777518, at *1 (E.D. Tex. Sept. 21, 2007). Similarly, a Texas federal judge wrote in a 2010 decision that:

> The Court finds that "Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering damages for lost earning capacity." *See Contreras v. KV Trucking, Inc.*, 2007 WL 2777518 (E.D. Tex. 2007); *Tyson Foods, Inc. v. Guzman*, 116 S.W.3d 233, 244 (Tex. App. –Tyler 2003, no pet.). Thus, despite evidence showing that the decedent did not have authorization to work in the United States and that he had obtained employment fraudulently by using a false social security number, the Court will allow the Plaintiffs to recover for lost earning capacity of the decedent. However, the Court finds that Defendants can offer evidence indicating the decedent's immigration status, that he did not have a work permit, and that he used a social security number fraudulently. The Court finds that this evidence goes to the nature and extent of any recovery for lost earnings.

*Sanchez v. Commerical Transportation, Inc.,* 2010 WL 11627661, at *1 (E.D. Tex. Jan. 26, 2010). *See also Figueroa v. Williams*, 2010 WL 5387599, at *8 (S.D. Tex. Dec. 17, 2010)(noting Texas law on this issue as stated in *Tyson*).

This court notes that the Texas state appellate court decision (*Tyson*) relied upon by these Texas federal judges was decided in 2003, which was the year after *Hoffman* was decided. Indeed, the Texas appellate court expressly distinguished *Hoffman* from the state tort law context, writing that:

> Tyson argues that the Court's holding in *Hoffman* demonstrates a federal congressional policy to refrain from awarding undocumented alien workers compensation for lost earning capacity. We disagree. First, this holding only applies to an undocumented alien worker's remedy for an employer's violation of the NLRA and does not apply to common-law personal injury damages. Next, Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering damages for lost earning capacity. *See Wal–Mart Stores, Inc. v. Cordova*, 856 S.W.2d 768, 770 n. 1 (Tex. App. El Paso 1993, writ denied).

*Tyson*, 116 S.W.3d at 244. The *Tyson* court thus noted that the Texas law which supports allowing recovery of lost wages by undocumented immigrants dates back to 1993, although *Tyson* strikes this court as being a more significant decision, since it re-affirmed that holding post-*Hoffman*.

As far as this court is aware, the Fifth Circuit has not, in the twenty-one years since *Tyson* was decided, cast doubt upon that decision even though, as noted above, the holding has been

applied in Texas federal district courts. While it is dangerous to read too much into a court's *silence* on a particular issue, twenty-one years strikes this court as being a very lengthy period of time for *Tyson* to have stood without criticism from the Fifth Circuit. This is particularly true considering that there are, presumably, a large number of tort actions filed by undocumented immigrants in the state of Texas.

This court additionally observes that, in *Hernandez v. M/V Rajaan,* 848 F.2d 498 (5th Cir. 1988), the Fifth Circuit rejected an employer's argument that an injured illegal alien longshoreman should be deemed ineligible to recover lost future United States wages because he was not entitled to be present and employed in the United States for the remainder of his life. *Id.* at 500. *Hernandez* was a personal injury case brought pursuant to section 905(b) of the Longshore and Harbor Worker's Compensation Act, not a state court action, and it preceded the U.S. Supreme Court's decision in *Hoffman*. It is, therefore, difficult to say exactly how much precedential weight *Hernandez* should carry today, but at least one district judge in the Fifth Circuit has concluded that it carries heavy precedential weight even after *Hoffman*.

In *Minerva Avalos v. Atlas World Grp., Inc*., 2005 WL 6736327, at *3 (S.D. Miss. Apr. 4, 2005), U.S. District Judge Lance Africk emphasized that, while *Hernandez* was decided before *Hoffman*, the Fifth Circuit in *Hernandez* had reached its holding largely by distinguishing the U.S. Supreme Court's decision in decision in *Sure–Tan, Inc. v. N.L.R.B.,* 467 U.S. 883, 104 S. Ct. 2803 (1984).[4] Judge Africk noted that *Sure-Tan* constituted a major precedential basis for *Hoffman* and that, since the Fifth Circuit had distinguished *Sure-Tan* in *Hernandez,* the rationale for the Fifth Circuit's holding in *Hernandez* survived *Hoffman*.

---

[4] This court notes that *Minerva* was a Southern District of Mississippi decision, even though Judge Africk normally serves as a Louisiana district court judge. It is unclear to this court what circumstances led this to occur.

24

Specifically, Judge Africk wrote in *Minerva* that:

> Distinguishing the Supreme Court's decision in *Sure–Tan,* the Fifth Circuit noted that
> "[a]s a private citizen, [plaintiff's] relationship to [defendant] is not the same as the
> plaintiffs' relationship with their employer in *Sure–Tan,* in which a back-pay remedy
> applied by the National Labor Relations Board was found to implicate labor policy
> considerations." *Id.* Instead, the Fifth Circuit held that it was not error to grant damages
> based upon an injured plaintiff's employment status at the time of injury and for a lengthy
> period preceding such injury. *Id .* The Fifth Circuit stated that once an injured illegal
> alien established future damages based upon United States wages, the burden shifted to
> the defendant to establish that the use of such wages was "factually improper and, if so,
> what a proper measure of damages should be." *Id.* The Fifth Circuit concluded that
> because there was no proof that the plaintiff was about to be deported or would surely be
> deported, it was not error to calculate future lost wages on an illegal alien's past earnings
> stream.

*Minerva*, 2005 WL 6736327, at \*3.  Judge Africk thus concluded that *Hernandez* supported a

conclusion that the plaintiff's immigration status should not, *per se*, bar him from recovering lost

wages in the tort action before him.  *Id.  Minerva* plainly constitutes additional persuasive

authority for plaintiffs on this issue, even though Judge Africk ultimately barred the recovery of

lost wage damages in that case based upon certain case-specific weaknesses in the expert

testimony offered by the plaintiff.[5]

While there is thus a considerable amount of helpful Fifth Circuit authority for plaintiffs

on this issue, defendant emphasizes that there is one Mississippi district court decision which

supports its position in this case.  In a 2010 decision, Judge Guirola barred the claims of

undocumented plaintiffs based both upon his reading of *Hoffman Plastic* and based also upon

what he found to be factual weaknesses in the plaintiffs' proof of lost wages.  *Garcia-Lopez v.

Bellsouth Telecommunications, Inc*., 2010 WL 1873042, at \*7 (S.D. Miss. May 7, 2010).

Specifically, Judge Guirola wrote that:

---

[5] Specifically, Judge Africk found that the plaintiff's expert had improperly calculated his lost
wages based on the assumption that he would work in the United States until age sixty-six, even
though the decedent had expressed an intent to return to Mexico in two years.  *Id.* at \*4.

All of the plaintiffs testified at their depositions that they live in either Texas or Louisiana. None of the plaintiffs have expressed any intention to return to their native countries or produced any evidence to support their lost wages and loss of earning capacity claims. For example, Garcia and Sorto claim that they are entitled to $500 a week in lost wages for the next twenty years. They have never filed tax returns, were paid cash for all previous work, and claim that they do not remember the name of their past employers. Uresti claims that he is entitled to approximately $40,000 in lost wages, but he has never filed a tax return and states that he was paid cash.

The Court finds that the plaintiffs' lost wages and loss of earning capacity claims are barred by IRCA and *Hoffman Plastic,* because any work performed by the plaintiffs in the United States would be illegal. The Court further finds that any claim for lost wages or earning capacity whether pertaining to the United States or the plaintiffs' native countries would be entirely speculative. *See Potts v. Miss. Dep't of Transp.,* 3 So.3d 810, 814 (¶ 11) (Miss. Ct. App. 2009) (holding that proof of lost or diminished earning capacity must be established by substantial evidence and cannot be left to mere conjecture).

*Garcia-Lopez*, 2010 WL 1873042, at *7.

This court notes that, at no point in his decision in *Garcia-Lopez* did Judge Guirola indicate that Mississippi state appellate courts have taken a position either way on this issue, and this court is unaware of any Mississippi appellate court decisions on this issue either. Judge Guirola did appear to disagree with the four decisions cited above which concluded that *Hoffman* does not, based on its own precedential weight, support barring lost wage claims by undocumented immigrants in state tort claims. This court believes that this disagreement reflects the fact noted in Milczarek-Desai's law review article quoted above, namely that this is a close and difficult issue regarding which reasonable judges have differed and will continue to do so.

While this court will reserve a final ruling on this issue until the directed verdict and/or jury instruction phase of trial, its present inclination is to agree with the courts which have concluded that the ability of undocumented immigrants to recover damages for lost wages in tort action is a question of state law whose result is not dictated, either way, by *Hoffman* or any other federal precedent. In expressing this inclination, this court is heavily influenced by the collective

weight of the state and federal authority discussed above, and it finds the analyses offered in those opinions to be persuasive. Moreover, since no Mississippi appellate courts appear to have weighed in on this issue either way, this court believes that the operating assumption, in the absence of any indication to the contrary, should be that the Mississippi legal standards for the recovery of lost wages should apply equally to all plaintiffs, regardless of their immigration status.

In so stating, this court notes that tort law has its own logic and policy goals which it seeks to advance, which include encouraging individuals to exercise due care in their actions which affect others, lest they be held financially responsible when they fail to do so. That being the case, it is unclear to this court what tort policy goals would be advanced by letting it be known that it is "cheaper" to negligently injure or kill an undocumented immigrant than a United States citizen, since compensation for lost wages will not have to be paid in the former case. While this court believes that these policy considerations apply in all tort cases, it submits that they weigh particularly heavy in wrongful death cases such as this one. In such cases, a human life has been taken and, in most cases, surviving relatives have seen their financial support greatly reduced or eliminated. In many cases, these relatives will include young children who played no role in the decision to illegally enter this country or who stayed in their home countries yet depended financially upon their parent working in the United States. In this sense, preventing the recovery of loss of earnings damages by surviving relatives in wrongful death cases strikes this court as being one of the worst potential policy means to encourage compliance with national immigration laws, since it would disproportionately impact innocent and vulnerable individuals.

This court further believes that, if one were to assume that this is an issue which requires an *Erie*-guess regarding how the Mississippi Supreme Court would decide this issue, then it tends to suspect that that Court would follow the lead of Texas appellate courts and conclude that undocumented immigrants should be allowed to recover lost wages in tort actions. In so stating, this court notes that, while conservative views regarding illegal immigration prevail among many citizens in this state, this is most certainly the case with Texas as well. Texas appellate courts have nevertheless concluded since 1993, and re-affirmed shortly after *Hoffman*, that national immigration policy issues should be kept separate and distinct from tort damages issues. Once again, Texas federal district courts have followed this approach as well, and this court believes that, considering Texas' very extensive experience in dealing with issues relating to undocumented immigrants, the Mississippi Supreme Court would likely defer to its approach in this regard. To reiterate, the Fifth Circuit has not (to this court's knowledge) cast doubt upon this approach, to the contrary, it itself allowed undocumented immigrants to recover lost wages in a distinct but arguably related context in *Hernandez*. These considerations make this court even more inclined to follow the Texas approach in this case, and, accordingly, it is disinclined to bar plaintiffs from pursuing their claims for lost wages at trial, based solely on *Hoffman*. This court is open to additional authorities and arguments on this issue, however, and the parties may submit such in a trial brief, if they wish to do so.

Having expressed its inclination regarding the legal issues arising from *Hoffman*, this court will now address defendants' argument that plaintiffs are unable to offer sufficiently reliable and admissible evidence to support their claim for lost wages. In considering these arguments, this court agrees with defendants that plaintiffs' status as undocumented immigrants working "off the books" has, as with many similar plaintiffs nationwide, left them with serious

weaknesses in the proof of lost wages which they are able to offer. Defendants argue that this is particularly true in the case of the two deceased plaintiffs, who are not able to take the stand at trial and testify regarding their lost wages and must instead rely upon statements from surviving relatives which, defendants contend, are inadmissible hearsay. Plaintiffs note, however, that Federal Rule of Evidence 703 makes it clear that evidence need not necessarily be admissible at trial for an expert to rely upon it in forming his opinions. Specifically, Rule 703 provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

*Id.*

It appears to this court that both sides have reasonable arguments to make on this issue, and, since the crucial factor in this context appears to be the reliability and probative value of plaintiffs' proof of lost wages, it intends to hold a special hearing at trial, outside of the presence of the jury, where both sides can preview the proof they wish to present on this issue so that its reliability may be assessed. While it is not clear to this court whether plaintiffs will be able to support their claims for lost wages with sufficiently reliable evidence at trial, it believes that, in cases where a close call is presented, judicial economy considerations tend to support allowing plaintiffs to present their best proof on an issue at trial, subject to this court potentially disallowing any recovery for lost wages at the directed verdict, jury instruction or JNOV stage of trial.

In so stating, this court emphasizes that there is no irrevocable harm which can occur by allowing plaintiffs to make their best efforts to establish their claim for lost wages at trial, since it

can always decide after the fact that they have presented insufficient proof to allow this element of damages to go to the jury or to allow a jury verdict to stand. Indeed, it arguably makes the most sense to decide particularly close issues at the JNOV stage of trial, since this gives the Fifth Circuit jury findings to work with, which it can either affirm or vacate on appeal. Without such jury findings, the Fifth Circuit's only option, if it concludes that this court erred in taking the issue from the jury, is to remand for a new trial on damages. This court therefore believes that judicial economy considerations support erring on the side of allowing jurors who have given their time and effort listening to the evidence at trial to make too many, rather than too few, findings of fact. Judicial economy considerations aside, this court notes that the unsettled legal issues arising from *Hoffman* are some of the thorniest ones which it has encountered, and it arguably makes sense to "tee these issues up" for the Fifth Circuit to make whatever ruling it sees fit. This court is inclined to think that the best way to do this is to at least allow jurors to make fact findings regarding lost wages *if* their proof at trial supports this court of action.

It strikes this court that plaintiffs' fundamental difficulty in proving their loss of earnings damages arise not from a lack of diligence on their part during discovery, but, rather, the basic facts that 1) they, or their decedents, were working "off the books" as undocumented immigrants in this country and 2) two of the plaintiffs' decedents died in the accident at issue in this case and are accordingly unavailable to testify regarding their work experiences. While these facts do not authorize this court to overlook the rules of evidence, and it will not do so in this case, it does believe that they support taking a "wait and see" approach regarding whether plaintiffs will be able to offer admissible evidence at trial which is sufficient to establish triable jury issues regarding their loss of earnings damages.

This court believes that, while FRE 703 does allow experts to rely upon hearsay evidence in certain circumstances, it would be to plaintiffs' advantage to offer whatever non-hearsay evidence they can to support their claim for lost wages. For example, this court believes that testimony that a witness personally observed one or both decedents doing construction work would be of at least some value in establishing the nature of the work they did in this country. It further seems possible that plaintiffs will be able to use Brister's expert testimony to try to establish what an undocumented worker would be able to earn working in construction over the decedents' remaining life expectancy. Defendants argue that such proof would be insufficient to establish triable jury issues regarding loss wages, but this court is inclined to reserve judgment on this issue and rule upon it after the presentation of evidence at trial, including Brister's testimony.

In noting its inclination in this regard, this court observes that defendants' own favored approach is for it to essentially instruct the jurors to offer no recovery at all for the present net cash value of decedents' work life experience. This strikes this court as a highly questionable result in its own right, since, if plaintiffs are able to establish, through admissible evidence at trial, that the decedents were working in a certain capacity in this country, then the notion that they would have earned nothing at all during their lives would clearly represent an incorrect calculation of damages. This court further observes that there is a large amount of guesswork inherent in predicting what most decedents would earn during their life expectancy, since one is dealing with future events which are, by their very nature, difficult to predict in most cases. In this vein, this court notes that the decedents in this case were not GS-salaried government workers who could be assured that they would get predictable step increases over the course of their careers. They were, to the contrary, undocumented workers, and it seems clear that the

future earning potential of such workers would depend upon a number of factors which are very difficult to predict. This does not necessarily mean, however, that this court should simply throw up its hands and despair of making any fact-findings on this issue.

In so stating, this court emphasizes that there are two things which it does know with certainty, namely 1) that the decedents were not working for free in any jobs they may have performed and that, as a result 2) the present net cash value of their lives has at least some value. That being the case, it is unclear to this court why it should favor the zero valuation of the net cash value of the decedents' lives urged by defendants, when it knows this valuation to be incorrect, when it could instead submit the best available evidence to jurors so that they may exercise their best judgment in this regard. Having said that, this court does agree that there are limits to the leniency which it may demonstrate to plaintiffs in offering proof in this regard, and it will attempt to ascertain at the hearing just how weak or strong their evidence on this issue is. With this caveat, defendants' summary judgment motion seeking to prevent plaintiffs from offering evidence on this issue at trial, and their associated motion to strike Brister's expert testimony, will be denied at this juncture.

The final motion for consideration is defendants' motion for summary judgment as to plaintiffs' claim for punitive damages, which this court finds to be well taken. In so stating, this court notes that, while it believes that plaintiffs have potentially strong arguments that the presence of the mobile home along the side of the highway was the result of negligence and/or a product defect attributable to one or more defendants, it does not believe that any of defendants' alleged conduct was of a sufficiently reprehensible nature to warrant the imposition of punitive damages. In arguing otherwise, plaintiffs point to Burns' decision not to pull his truck over as far as he would have otherwise done, based on concerns that his truck would get stuck in the

mud.  While this court believes that this decision was quite arguably negligent, it simply does not

regard it as sufficiently reckless or outrageous to warrant an imposition of punitive damages.

Having said that, this court notes that Miss. Code Ann. § 11-1-65(1)(c) provides that:

> (c) If, but only if, an award of compensatory damages has been made against a party, the
> court shall promptly commence an evidentiary hearing to determine whether punitive
> damages may be considered by the same trier of fact.

*Id.*  This "shall" language arguably makes a punitive damages hearing mandatory in cases where

a jury awards compensatory damages, *see Bradfield v. Schwartz*, 936 So. 2d 931, 939 (Miss.

2006) and this court may have no choice but to conduct such a hearing if plaintiffs request one

after obtaining a jury verdict on compensatory damages.  With this caveat, this court does not

regard the facts of this case as supporting punitive damages, and defendants' motion for partial

summary judgment on punitive damages will therefore be granted.

In light of the foregoing, it is ordered that defendants' motions for summary judgment as

to liability [176-1, 189-1] are denied; defendants' motion for summary judgment as to specific

damages [180-1] is granted in part and denied in part; defendants' motion for summary judgment

as to punitive damages [178-1] is granted;  defendants' motions to strike plaintiffs' experts  [182-

1, 184-1, 192-1, 194-1] are denied.  Plaintiffs concede that they lack viable claims against

defendant Hamilton Home Builders, LLC, and it is therefore dismissed from this action.

This, the 28th day of May, 2024.


/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI